IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


| | | |
|---|---|---|
| DANIEL R. SPAK | : | |
| Plaintiff | : | |
| v. | : | 3:CV-06-152 |
| | : | (JUDGE VANASKIE) |
| METLIFE, METLIFE/HARTFORD | : | |
| SYNCHRONY | : | |
| Defendants | : | |


MEMORANDUM

This is a disability discrimination in employment action.[1]  Plaintiff Daniel Spak claims

that Metropolitan Life Insurance Company ("MetLife") and Synchrony (collectively

"Defendants") terminated his employment in August, 2004, because of a disability he

attributes to mental health issues.  Defendants assert that summary judgment is appropriate

in this matter because, inter alia, Spak's employment was terminated when he voluntarily

abandoned his job, and was not due to disability bias.  Because Spak has failed to produce

evidence that he was terminated for a reason other than voluntary abandonment,

Defendants' Motion for Summary Judgment (Dkt. Entry 27) will be granted.

---

[1] Plaintiff has voluntarily withdrawn claims of retaliation and discrimination against American workers.

1

I.      BACKGROUND

    A.      Factual Background[2]

Daniel Spak was hired by MetLife in 2000 as a computer programmer analyst.  (Dkt. Entry 28-2, Exhibit A, Spak Deposition, at 42:21 - 22.)  When hired, Spak had the skills that were necessary to adequately perform the job.  (Dkt. Entry 28-2, Exhibit C, Fortney Deposition, at 13:17 - 18.)  Spak's performance improved over the course of his employment.[3]  (Dkt. Entry 30, Fortney Exhibits 1 - 3.)  Based on Spak's 2003 performance rating, he received a $3,000 salary increase on April 1, 2004, and a $6,500 bonus on March 12, 2004.  (Id. at Exhibits 4 & 5; Dkt. Entry 28-2, Exhibit C, Fortney Deposition, at 27:24 & 33:22 - 35:7.)

Between 2002 and 2004, Spak experienced numerous stressful events in his

---

[2] Defendants complied with Local Rule of Court 56.1 by submitting in numbered paragraphs statements of fact contended to be undisputed and supported by citation to the summary judgment record. (Defendants' Statement of Undisputed Material Facts ("DSUMF"), Dkt. Entry 29.)  Spak has admitted 66 of the 84 statements without any qualification, and has admitted the substance of another 13 statements, but with some additional factual assertion. (Plaintiff's Response to DSUMF, Dkt. Entry 31.)  Consequently, many of the material facts are undisputed.  Reference to Defendants' Statement signifies that the fact is admitted and not in dispute.

[3] During Plaintiff's employment in 2001, his performance rating indicates that he met some expectations, meaning his work sometimes met and sometimes fell short of expectations (Dkt. Entry 30, Fortney Deposition, at Exhibit 1); during 2002, his performance rating indicates that he met expectations, meaning his work consistently met and sometimes exceeded expectations (Id. at Exhibit 2); and during 2003, his performance rating indicates that his performance exceeded expectations, meaning his work exceeded both expectations and contributions of other associates.  (Id. at Exhibit 3.)

personal life: Spak declared bankruptcy and suffered from other financial problems; his wife developed cancer and underwent numerous surgeries; his daughter sustained third-degree burns and sought treatment for emotional problems; his son developed a hydrocele and underwent surgery; his home flooded; and his house was placed in foreclosure.  (Dkt. Entry 28-3, Exhibit E, at 1 - 4.)  In connection with these events, Spak had multiple absences from work, as well as late arrivals and early departures. (DSUMF ¶ 10.)  Also during this period, Spak was treating with a psychologist, Robert E. Griffin, M.A., and a physician, Ernest R. Gelb, D.O., FACOFP, for anxiety disorder and depression.  (Griffin Aff., Ex. 3 to Plaintiff's Opp. Brief; Gelb Aff., Ex. 4 to Plaintiff's Opp. Brief.)

In early 2004, Spak's position was transitioned to the Annuities/Docucorp program at MetLife. (DSUMF, ¶ 5.)  In April 2004, Spak fell "behind on some projects," and his supervisors, Brian Fortney and Lillian Jones, sat down to have a "performance discussion" with him.  (Dkt. Entry 28-2, Exhibit C, Fortney Deposition, at 38:19 - 23.)  Spak was additionally given warnings regarding attendance issues between December 2003 and April 2004.[4]  (Id. at 43:1 - 3.)

---

[4] On December 12, 2003, Spak was late for work due to water damage at his home (Dkt. Entry 28-2, Exhibit A, Spak Deposition, at 48:12 - 49:4); on February 9, 2004, he emailed his supervisor that he would be late the following day due to remodeling of his home (Id. at 49:9 - 50:10); on March 10, 2004, Spak emailed his supervisor apologizing for a late arrival and notifying him that he would be leaving early (Id. at 52:6 - 16); on March 25, 2004, he left early to help his father do pipe work at his home. (Id. at 55:21 - 56:5.) Additionally, Spak had numerous absences due to sickness and travel.  On February 20,

During this same time period, Spak expressed frustration with MetLife. (DSUMF, at ¶ 13.)  He was dissatisfied with MetLife's sick leave policy and its bell-curve rating system. (Id. at ¶¶ 14-15.)  He also was displeased with the outsourcing of jobs, and attempted to dissuade several persons from working for MetLife. (Id. at ¶¶ 16-17.)

On Friday, April 2, 2004, Spak submitted an electronic request for leave on April 5, 6, and 7. (Id. at ¶ 19.)  He had already been granted leave for April 8 and 9 to visit colleges with his son. (Id. ¶ 18.)  He had also missed work on March 30 and 31.  (Id. ¶ 20.)  Because of concerns about Spak's recent inability to meet work deadlines, Spak's supervisor denied this request.  (Id. ¶ 21.)  In addition, Spak was placed on a performance plan.  (Id. ¶ 22.)  In response, Spak decided to be absent from work the entire week of April 5th, notwithstanding the denial of his request to be absent April 5, 6, and 7.

On April 13, 2004, Spak notified his supervisor by email that MetLife was causing a great deal of stress in his life and that he would "appreciate being terminated." (Dkt. Entry 28-2, Exhibit B, at 1.)  Spak, however, did not indicate the presence of any medical

---

2004, he was out sick (Id. at 50:11 - 51:17); on March 9, 2004, he took an "unexpected day off" to take his daughter to the doctors (Id. at 51:18 - 52:3); on March 31, and April 1, 2004, Spak failed to attend required training and failed to call his supervisor to inform him of his absence (Id. at 56:9 - 57:14); on April 4, 2004, he emailed his supervisor and notified him that he would be taking the whole week off, when he had only been approved for leave on April 8, and April 9, 2004 (Dkt. Entry 28-3, Exhibit G, at 1); and on April 12, 2004, he emailed his supervisor notifying him that he would not be at work because his carpet was being cleaned.  (Dkt. Entry 28-3, Exhibit F, at 1.)

condition or request any accommodation.  (DSUMF, at ¶ 25.)

Spak's supervisor forwarded the email to MetLife's Human Resources Department. Rhonda Biscette, a Human Resources Generalist, called Spak and advised him of his option to apply for short-term disability leave through Synchrony, an integrated absence management service provider which administered MetLife's short-term disability benefits for its employees.  (Id. at ¶ 26.)  Spak was pleased with MetLife's response and felt as though the Company was satisfactorily accommodating his needs.  He applied for short-term disability leave with Synchrony, and was approved for a short-term disability leave.  The approval was renewed through July 9, 2004.  (Id. at ¶¶ 27-28.)

Because the disability benefits that Spak received were less than his regular income, he was under increasing financial pressure during his time off from work.  As a result, he began charging many of his personal purchases on his corporate credit card.  Although MetLife's policies prohibit an employee from making personal purchases with the corporate credit card, Spak felt justified in living off of the company card because he had used his credit card in the past for personal purchases and, according to Spak, other employees also violated this policy.  (Id. at ¶¶ 29-31.)  Spak's personal purchases included everything from Wal-Mart and grocery purchases to payments for a golf membership; his son's college tuition; travel expenses when Spak took his entire family to Boston; books; compact disks; swimming pool supplies; cigarettes; gum; a computer; and a donation to the National

Aquarium in Baltimore.  (Id. at ¶ 32.)  In the month of May 2004 alone, Spak incurred corporate credit charges for personal items in excess of $8,000, more than twice the amount of charges he had ever previously incurred on his corporate credit card in any one month.  (Id. at ¶ 33.)

During the time of his short-term disability leave, Spak was home with his wife and daughter.  In addition to engaging in a substantial amount of shopping, he also enjoyed participating in various leisure/physical activities. Spak walked almost everyday for sometimes as much as four (4) hours; swam in his family's swimming pool; played basketball at the playground; and golfed.  He drove his daughter to and from school, and engaged in the same type of "typical" shopping during this period that he engaged in throughout his entire life.  (Id. at ¶¶ 34-37.)

On August 2, 2004, Spak received notice that Synchrony had terminated his short-term disability benefits, retroactive to July 12, 2004, based on a finding that Spak was no longer disabled.  (Dkt. Entry 28-3, Exhibit K; Dkt. Entry 28-2, Exhibit A, Spak Deposition, at 244:10 - 23.)  Spak's supervisor, Brian Fortney tried to contact Spak by phone to discuss returning to work and left more than one message notifying him that Synchrony had terminated his disability claim.  (Dkt Entry 28-2, Exhibit C, Fortney Deposition, at 40:20 - 41:24.)  Spak never responded to these messages. (Id. at 42:1 - 2; Dkt Entry 28-2, Exhibit A, Spak Deposition, at 249:12 - 14 & 265:19 - 266:2.)

After receiving the short term disability termination letter, Spak contacted Rhonda Biscette, complaining about Synchrony's management of his short-term disability leave. During the course of this conversation, Spak did not request a leave of absence or any other accommodation.  (DSUMF, at ¶¶ 49 - 50.)  Biscette told Spak that if he was dissatisfied with the short-term disability decision, he could appeal that decision to Synchrony.  (Id. at ¶ 51.)

On August 20, 2004, Psychologist Griffin wrote the following letter, addressed "To who [sic] it may concern":

> The above-captioned individual has been in treatment at my office since April 15th, 2004.  Mr. Spak had been experiencing severe stress at work and at home.  There had been several life-threatening illnesses in Mr. Spak's family over several years, and financial crisis.  There also appears to have been workplace trauma.  I believe that stress had been building for several years.
>
> My recommendation to his employer's disability department was that Mr. Spak would likely be able to return to work at the beginning of September 2004, I was surprised when his disability benefits were terminated, and I believe that this was premature.  I believe that this has added to his stress and negatively impacted on his ability to marshal the resources necessary to work.

(Dkt. Entry 33, Ex. 1.)

After a week had elapsed since sending the notification of the short-term disability termination, and Spak had failed to contact his supervisors about returning to work, Biscette sent him a letter, dated August 11, 2004, directing him to return to work by August 23, 2004, or contact the Human Resources Department to discuss accommodations ("return to work

7

letter"). (DSUMF, at ¶ 55; Dkt. Entry 28-3, Exhibit M.) The return to work letter also

specifically stated that if Spak failed to return to work by August 23, MetLife's records would

"be updated to reflect that both [Spak's] employment and leave status terminated as of

[August 23, 2004] for job abandonment." (Dkt. Entry 28-3, Exhibit M.)

This letter was sent pursuant to MetLife's policy on short-term disability and job

abandonment. (DSUMF, at ¶ 57.) It is undisputed that this policy calls for termination of an

employee who fails to return to work or request personal leave or some other

accommodation within five days of receipt of a letter requesting the employee to return to

work. (Id. at ¶ 58.) It is also undisputed that Spak received the return to work letter and did

not respond to it. (Id. at ¶¶ 60-61.) Spak also admits that he did not return multiple phone

calls placed to him about returning to work. (Id. at ¶ 61.)

Spak failed to return to work on August 23, and did not contact the Human

Resources Department to discuss any accommodation. (Dkt. Entry 28-4, Exhibit O,

Termination Letter.) Consequently, in a letter dated September 1, 2004, MetLife advised

Spak that his employment had been terminated due to job abandonment. (Id.)

B.      Procedural Background

On March 20, 2005, Spak filed a Charge of Discrimination with the Pennsylvania

Human Relations Commission, alleging that he "was discriminated against due to [his]

disability." (Dkt. Entry 28-4, Exhibit Q.) On January 20, 2006, Spak, proceeding pro se,

commenced this litigation, asserting disability claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq., and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. C.S.A. § 951, et seq. (Dkt. Entry 1.) On July 12, 2006, Defendants counterclaimed, asserting breach of contract and conversion. (Dkt. Entry 2.) Plaintiff, now represented by counsel, answered Defendants' counterclaim on July 28, 2006. (Dkt. Entry 4.) After completing discovery, Defendants filed a motion for summary judgment on January 31, 2008, (Dkt. Entry 21), which this Court denied on February 1, 2008, due to failure to file a certificate of concurrence or non-concurrence in compliance with Local Rule 7.1. (Dkt. Entry 22.) Defendants' Motion for Summary Judgment was properly refiled on February 5, 2008. (Dkt. Entry 27.) The motion is fully briefed and ripe for decision.

II.    DISCUSSION

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is "material" if proof of its existence or non-existence might affect the outcome of the suit under applicable law. Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248 (1986). "Facts that could alter the outcome are material facts." Charlton v. Paramus Bd. of Educ., 25 F.3d 194, 197 (3d Cir. 1994). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."

Anderson, 477 U.S. at 248.

Initially, the moving party must show the absence of a genuine issue concerning any material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to the nonmoving party. White v. Westinghouse Elec. Co., 862 F.2d 56, 59 (3d Cir. 1988). Once the moving party has satisfied its burden, the nonmoving party "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." Anderson, 477 U.S. at 257. Mere conclusory allegations or denials taken from the pleadings are insufficient to withstand a motion for summary judgment once the moving party has presented evidentiary materials. Schoch v. First Fidelity Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990). Rule 56 requires the entry of summary judgment if there was adequate time for discovery and a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

A.     Spak's Disability Discrimination Claim

As noted above, the facts underlying this litigation are generally undisputed. The undisputed facts must be assessed in the context of controlling legal principles to determine

whether summary judgment is warranted.

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability . . . in regard to the job application procedures, the hiring, advancement, or discharge of employees . . . ." 42 U.S.C. § 12112(a).  The analytical framework of a disability discrimination action under the PHRA is essentially identical to that of a claim under the ADA.  See Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 382 (3d Cir. 2002);  Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996); Connors v. Chrysler Fin. Corp., 160 F.3d 971, 972 (3d Cir. 1998).  Accordingly, the analysis of Spak's ADA claim is equally applicable to his claim of disability discrimination under the PHRA.

Successful discrimination claims can be established in two ways: by direct evidence that the employer's decision was motivated by discrimination; or by indirect evidence which creates an inference of discrimination under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  There is no direct evidence of discrimination.  Accordingly the familiar burden-shifting framework must be used.

Under this scheme, the plaintiff must first present sufficient evidence to establish a prima facie case of discrimination.  A plaintiff establishes a prima facie case of discrimination by showing that: (1) he was a member of a protected class (i.e., was disabled under the ADA); (2) he was qualified for the position in question, with or without

accommodation; and (3) he suffered an adverse employment decision, such as discharge, as a result of the discrimination.  See Shaner v. Synthes, 204 F.3d 494, 500 (3d Cir. 2000); Taylor, 184 F.3d at 306.

If a plaintiff presents a prima facie case of discrimination, "the burden of production (but not the burden of persuasion) shifts to the employer to produce some legitimate non-discriminatory reason for the discharge." Keller, 105 F.3d at 1518-19; Olson v. Gen. Elec. Astrospace, 101 F.3d 947, 951 (3d Cir. 1996).   Once the employer has met this burden of production, it is incumbent upon the plaintiff to show that the asserted reason is a mere pretext for discrimination.  Olson, 101 F.3d at 952; Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994).

To survive summary judgment where the employer offers evidence of a legitimate non-discriminatory reason for the adverse employment decision, the plaintiff must produce evidence "from which a fact-finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes, 32 F.3d at 764; see Showalter v. Univ. of Pittsburgh Med. Ctr., 190 F.3d 231, 235 (3d Cir. 1999).  "'To discredit the employer's proffered reason, [ ] the plaintiff cannot simply show that the employer's decision[s] [were] wrong or mistaken . . . . Rather the moving plaintiff must demonstrate such weaknesses or implausibilities, inconsistencies, incoherencies, or

contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact-finder could find them unworthy of credence." Fuentes, 32 F.3d at 765 (citing Ezold v. Wolf, Clock, Schorr & Solis-Cohen, 983 F.2d 509, 523 (3d Cir. 1992)).

Defendants vigorously (and with ample justification) argue that Spak does not fall within the purview of the ADA because his mental health issues did not substantially impair his ability to perform any major life activity.  There is no need to address this issue, however, as it is clear that no reasonable juror could find that MetLife's articulated rationale for terminating Spak's employment – job abandonment – was a pretext for disability discrimination.[5]

MetLife's policy for "Discontinuance of Associates Receiving Disability/ Workers' Compensation Benefits" states that "[p]rior to termination, the associate should be given the opportunity to: [r]eturn to work (with or without a reasonable accommodation); [a]ssert a need for continued FMLA/ state law leave (if eligible); and [r]equest a personal leave of absence (if the business can support it or as an accommodation)."  (Dkt. Entry 28-3, Exhibit M, MetLife Policy.)  Additionally, the policy provides:

---

[5] Defendants' Motion for Summary Judgment asserts that Synchrony is entitled to summary judgment for the same reasons as MetLife and additionally because Synchrony is not Spak's employer.  The Brief in Opposition fails to address Synchrony's liability under the ADA or the PHRA.  Additionally, Plaintiff fails to assert what role, if any, Synchrony played in Spak's employment separation.  Thus, under the circumstances, it is evident that Synchrony is entitled to summary judgment.

> The HR Generalist may send the employee a discontinuance letter stating
> that the associate is expected to return to work with or without an
> accommodation, unless s/he is requesting a personal leave of absence.  If the
> associate neither responds nor returns to work within 5 days of receipt of the
> letter, the Company will take steps to recognize that the associate has
> abandoned his/her position.

(Id.)

Here, Rhonda Biscette sent Spak the return to work letter on August 11, 2004,

requesting that he return to work by August 23, 2004.  (Dkt. Entry 28-3, Exhibit M, Letter.)

The letter clearly stated that Spak either had to return to work or, if necessary, contact the

Human Resources Department about any needed accommodation to assist in his return to

work.  The letter warned Spak "[i]f you do not return by [August 23, 2004], MetLife's records

will be updated to reflect that both your employment and leave status terminated as of such

date for job abandonment."  (Id.)  Spak does not dispute receipt of the letter and admits that

he chose to neither contact the Human Resources Department nor return to work.

(DSUMF, at ¶¶ 60, 62.)

Spak asserts that the reason he did not return to work was "because Dr. Griffin

ordered [him] not to work."[6] (Dkt. Entry 30, Plaintiff's Exhibit #2, Spak Affidavit, at ¶ 4.)

Griffin's affidavit indicates that Spak was cleared to return to work in the "beginning of

---

[6]  Significantly, in an August 11, 2004, letter to his doctors, Spak stated, "I don't feel
MetLife is a company I want to work for, and I am actively seeking other employment." (Dkt.
Entry 28-4, Exhibit N, ¶4.)

September, 2004."[7] (Dkt. Entry 30, Plaintiff's Exhibit 3, Griffin Aff., at ¶ 1.)  This limitation is expressed in Griffin's letter sent to the "disability department."  Plaintiff admits that disability issues were handled by Synchrony.  MetLife has shown that Synchrony representatives do not share medical information with MetLife's Human Resources Department.  (See Dkt. Entry 28-3, Aff. of Rhonda Biscette, Exhibit M.)  Moreover, Ms. Biscette has testified, without contradiction, that she was not contacted by any of Spak's doctors to discuss when he could return to work or whether any kind of accommodation was needed.  In short, there is no competent evidence that MetLife was presented with any request on behalf of Spak to defer his return to work date or to make any accommodation.[8]

Spak realized the importance of responding to MetLife, but admits that he did not want to talk to MetLife and was incensed at what a "lousy company MetLife" was.  He also thought that he could change his mind later.  (Dkt. Entry 28-2, Exhibit A, Spak Deposition, at 262:19 - 256:6; 264:11 - 20.)

---

[7] Spak has not explained why his doctor's recommendation of a return to work in early September would preclude his return to work in late August.  Significantly, Spak did not request a brief deferral of his return to work.

[8] During his deposition, when asked whether he had any evidence of whether his doctors corresponded with MetLife as opposed to Synchrony, Spak responded, "I don't have any evidence. They may have. I never asked them for evidence." (Dkt. Entry 28-2, Exhibit A, Spak Deposition, at 269:20 - 24.)  Notably, the same day Biscette sent the return to work letter, Spak sent letters to his three doctors requesting letters to "attach to the appeal" of Synchrony's decision to retroactively drop his short-term disability benefits.  (Dkt. Entry 28-3, Exhibit N; DSUMF, at ¶ 59.)  Spak requested that the doctors' letters discuss why the doctors "don't agree with [the] decision to drop" his benefits.  (Dkt. Entry 28-4, Exhibit N.)

To survive a motion for summary judgment, Spak must produce facts that would cause a reasonable fact-finder to disbelieve the employer's legitimate reason, or believe that invidious discrimination was more likely than not a motivating or determinative cause of Spak's separation.  See Fuentes, 32 F.3d at 764; Showalter, 190 F.3d at 235.  Spak has asserted that he was fired because he was of no use to MetLife with his disability and because there was a conspiracy between Synchrony and MetLife to terminate his disability benefits.  (Dkt. Entry 30, Brief in Opposition, at 13.)  These assertions, without more, do not support an inference that his evident job abandonment was a pretext for discrimination.[9]

Conclusory allegations by Spak are insufficient to withstand a motion for summary judgment once MetLife has presented evidentiary materials of a legitimate, non-discriminatory reason for Spak's discharge.  Schoch, 912 F.2d at 657.  To discredit MetLife's abandonment assertion, Spak had to show weaknesses, implausibilities, inconsistencies, or contradictions in the assertion, so that a reasonable fact-finder could find

---

[9]  Plaintiff has not alleged that employees of MetLife made any negative comments about his alleged disability.  When prompted in the ADA Intake Questionnaire about whether any inappropriate statements had been made, Plaintiff responded that "Charran Ward of Hartford Synchrony, MetLife's Short-Term-Disability arm of the company, was very obnoxious and belligerent and harassing on the phone to me. . . . I complained about him to his superiors, detailing what he said." (Dkt Entry 28-4, Exhibit T, at 4.)  Since Spak fails to assert that anyone other than Charran Ward, who was not a MetLife employee, allegedly made negative comments, Plaintiff has failed to provide a foundation for the assertion that MetLife invidiously discriminated against him because of his disability.  (Dkt. Entry 30, Brief in Opposition, at 13.)

the abandonment theory unworthy of credence.  See Fuentes, 32 F.3d at 764.  No evidence

has been produced to support these assertions.  It is undisputed that Spak failed to return to

work or contact MetLife to request accommodation.  Spak has not shown that other

employees who absented themselves from work without contacting MetLife were treated

more favorably.  A reasonable fact-finder could not disbelieve that Spak abandoned his job

or believe that invidious discrimination was the cause of the separation.  Accordingly,

Defendants' Motion for Summary Judgment will be granted.  See Antonio v. Sygma

Network, Inc., 458 F.3d 1177, 1182-83 (10th Cir. 2006) (summary judgment in favor or

employer where plaintiff failed to call into question employer's application of job

abandonment policy); LaResca v. American Tel. & Tel., 161 F. Supp. 2d 323, 336 (D.N.J.

2001) (same).

     B.    MetLife's Counterclaims

     MetLife counterclaimed against Spak, alleging two state law causes of action: breach

of contract and conversion.  (Dkt. Entry 16.)  In light of dismissal of Plaintiff's discrimination

in employment claims, it is appropriate to consider whether supplemental jurisdiction over

the remaining state law counterclaims should be declined.[10]  See 28 U.S.C. § 1367(c)(3).

---

     [10] The Judicial Improvements Act of 1990, 28 U.S.C. § 1367(c)(3), provides that "The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction . . ."

After dismissal of all federal claims, a district court may decline to exercise supplemental jurisdiction over the remaining state law claims if it finds that the parties will not be prejudiced and that the interests of judicial economy would be served.  See Stehney v. Perry, 101 F.3d 925, 939 (3d Cir. 1996); Murphy v. Florida Keys Elec. Coop. Ass'n, Inc., 329 F.3d 1311, 1320 (11th Cir. 2003) (finding that the court had discretion to dismiss state law counterclaims once summary judgment had been granted on all federal claims); Western Wholesale Supply, Inc. v. Holladay, 25 Fed. Appx. 507, 509 (9th Cir. 2001) (finding that after the dismissal of all federal claims "the district court did not abuse its discretion in dismissing the state law counterclaims under 28 U.S.C. § 1367(c)(3)").  "Courts should ordinarily decline to exercise supplemental jurisdiction over state law claims when the federal claims are dismissed." Kis v. County of Schuylkill, 866 F. Supp. 1462 (E.D. Pa. 1994).  The decision in exercising supplemental jurisdiction "is committed to the sound discretion of the district court." Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 444 (3d Cir. 1997).

"In determining whether to exercise supplemental jurisdiction, the initial inquiry is whether the federal and state claims are so related that they derive from a common nucleus of operative facts and are such that the plaintiff would ordinarily be expect to try them in one judicial proceeding." Glaziers & Glassworkers Union v. Newbridge Secs., Inc., 823 F. Supp. 1191, 1197 (E.D. Pa. 1993) (citing Arnold v. Kimberly Quality Care Nursing Serv., 762 F.

Supp. 1182, 1186 (M.D. Pa. 1991)).  Principles of judicial economy, convenience, and fairness to the litigants, should be taken into account by the court, as should the stage of the litigation, possible prejudice to the parties, and whether the state law claims involve issues of federal policy.  Id.

Here, there is a common nucleus between Spak's claim of discrimination and MetLife's claims for breach of contract and conversion. " See Glaziers & Glassworkers Union, 823 F. Supp. at 1197.  Spak admits that "[a]lthough MetLife's policies prohibit an employee from making personal purchases with the corporate credit card . . . Spak felt justified in living off of the company credit card because he had used his credit card in the past for personal purchases and, according to Spak, other employees also violated this policy."  (DSUMF, at ¶ 31.)  Spak also admitted that he "never paid any of the debt of $13,282.95 (before interest) which he incurred on his corporate credit card . . . ." (Id. at ¶ 43.)  These admissions are logically related to the activities Spak was partaking in while on short-term disability leave, which provides evidence of the extent of his disability.  Thus, MetLife's conversion and breach of contract claims were compulsory counterclaims within the meaning of Federal Rule of Civil Procedure 13(a).

In this situation, there does not appear to be any prejudice to the Defendants if the state law claims are not retained in this Court.[11]  Pennsylvania has enacted a "savings

---

[11] MetLife did not move for summary judgment on the counterclaims.

statute." See 42 Pa. Cons. Stat. Ann. § 5103.  Under this statute, plaintiffs are permitted to file a certified transcript of federal proceedings in a state court and "the date of institution of the federal suit [serves] as the state court filing date for statute of limitations purposes, thereby obviating any limitations problems caused by dismissal." Rashid v. Kite, 957 F. Supp. 70, 75 (E.D. Pa. 1997); see also Weaver v. Marine Bank, 683 F.2d 744, 746 (3d Cir. 1982); Bezpalko v. Gilfillan, Gilpin & Brehman, No. 97-4923, 1998 WL 321268, at *7 (E.D. Pa. June 17, 1998) ("In addition, because Pennsylvania law provides that matters dismissed by a federal court for lack of subject matter jurisdiction may be refiled in the appropriate state court without regard to the limitations period, plaintiffs will not be prejudiced with respect to the applicable limitations period if they choose to refile their lawsuit."); Long v. National Football League, 870 F. Supp. 101, 106 (W.D. Pa. 1994) ("However, Pennsylvania law provides a plaintiff may effect a transfer of an action that has been dismissed by a federal court for lack of jurisdiction.  The statute of limitations for state law claims is tolled if a timely action has been filed in a federal court and dismissed.")

Additionally, Defendants counterclaims do not involve issues of federal policy, nor are there any issues of judicial economy or fairness that weigh in favor of maintaining the counterclaim in federal court.  Therefore, this Court will decline to exercise supplemental jurisdiction over Defendants' state law counterclaims and those counterclaims will be dismissed without prejudice.

III.     Conclusion

For the reasons stated, Defendants' Motion for Summary Judgment will be granted.

An appropriate Order follows.

s/ Thomas I. Vanaskie
Thomas I. Vanaskie
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


DANIEL R. SPAK                          :
                        Plaintiff       :
            v.                          :        3:CV-06-152
                                        :       (JUDGE VANASKIE)
METLIFE, METLIFE/HARTFORD               :
SYNCHRONY                               :
                        Defendants  :

ORDER

NOW, THIS 20th DAY OF OCTOBER, 2008, for the reasons set forth in the

foregoing memorandum, IT IS HEREBY ORDERED THAT:

   1.  Defendants' Motion for Summary Judgment (Dkt. Entry 27) is GRANTED.

   2.  Defendants' counterclaims (Dkt. Entry 16) are DISMISSED, WITHOUT

PREJUDICE.

   3.  The Clerk of Court is directed to enter judgment in favor of Defendants on

Plaintiff's claims and to mark this matter in this Court CLOSED.

                                    s/ Thomas I. Vanaskie
                                    Thomas I. Vanaskie
                                    United States District Judge